Standard Manufacturing Company, Appellant, vs. Slot,
Respondent.

*February 24—March 22, 1904.*

*Contracts: Signature induced by false representations: Fraudulent
intent: Evidence: Inexcusable negligence: Appeal: New trial.*

1. If false statements of fact, made by one party in negotiations
   leading to the execution of a contract, were of such a character
   as reasonably to excuse the other party from reading the con-
   tract and he was thereby induced to execute it, which he would
   not have done had he known its contents, such contract is not
   binding upon him unless he subsequently ratifies it with knowl-
   edge of the facts or in some other way precludes himself from
   rescinding it.
2. In an action upon a contract of sale which defendant claimed
   he had been induced to sign, without reading it, by the false
   representations of plaintiff's agent that it was a commission
   agreement, it is immaterial whether such representations were

made with fraudulent intent or not, and the admission of evidence of similar transactions between the agent and other persons, in no way involved in the litigation, offered for the purpose of showing such intent, was prejudicial error.

3. In such action plaintiff should have been allowed to ask defendant, on cross-examination, whether he had ever thought of the subject of consignment or of the word "commission" before the action was brought.

4. To entitle a party to relief from a contract on the ground of fraud, he must establish the fraud by a preponderance of the evidence, which also must be clear and satisfactory.

5. One who, when he signed a contract was inexcusably ignorant of its contents, is not entitled to relief from its obligations on the ground that the other party induced him to sign by false representations as to such contents.

6. Defendant, a business man of ordinary intelligence and considerable experience, signed, without reading it, a contract for the purchase of goods, both the vendor and the agent with whom the negotiations were had being strangers to him. In an action upon the contract he claimed that he had signed in reliance upon the agent's fraudulent representations that it was a mere commission contract. He admitted that the agent had requested him to read the paper before signing it, but testified that he did not do so because he was busy and because he did not usually read such papers before signing. After signing he laid the paper away. A mere glance at the few lines in close connection with the signature would have shown him that he was not making a commission contract and that he was signing a stipulation that he had read the contract and knew its contents and was satisfied therewith. *Held*, that even if false representations were made as to the contents of the instrument—a fact not clearly established—defendant's negligence was so inexcusable that he was not entitled to relief from the contract.

7. A mere motion in the trial court for judgment notwithstanding the verdict, without a motion to change the findings of the verdict to conform to the evidence, does not make it proper for the supreme court, on reversing the judgment entered upon the verdict, to dispose of the case finally without a new trial.

APPEAL from a judgment of the circuit court for Racine county: E. B. BELDEN, Circuit Judge. *Reversed.*

Action to recover on a written contract. The terms thereof are to the following effect: Plaintiff offered to furnish de-

fendant a specific quantity of flavoring extracts, toilet and miscellaneous articles for $173 upon certain conditions, and defendant accepted such offer.   Such terms and conditions were, in the main, that defendant might return any articles not found suitable to his trade, the purchase price thereof to be credited to him in payment for new goods to the extent of two thirds the price of the latter; that he might return any goods mentioned in the contract or thereafter ordered, returned to him by any consumer as unsatisfactory, if not more than half the contents had been used; that he might return any goods unsatisfactory in style, quality, price, salability, or for any cause, in payment for new goods as before stated; and that he should not countermand the order.   Plaintiff agreed to furnish show cases and other facilities specified to aid in displaying and selling the goods, guarantied a profit of $86.50 on the goods handled for one year, and agreed, if the sales were not sufficient to pay the same, to take back all goods at the purchase price, remaining on hand at the end of such year, or make up such profit in cash.   It was stipulated that all goods shipped and not on hand or returned, except free goods, should be considered as sold, and the profits figured at the difference between the net wholesale and retail prices named in the contract.   It was further stipulated that plaintiff's salesman possessed no authority to make any contract except by use of and according to plaintiff's regular form; that no goods should be considered as shipped on consignment or commission; that no representation made by the salesman should be deemed binding upon the plaintiff unless mentioned in the contract and received and accepted by plaintiff; that defendant should make certain specified efforts in selling plaintiff's goods, and pay the purchase price of $173 in four equal payments due in two, four, six, and eight months from the date of the invoice, provided the defendant sent, upon arrival of the goods, acceptances due as aforesaid; otherwise the $173, less five per cent., was payable upon such

arrival. The contract further contained stipulations that defendant had read the same, knew the contents thereof, and that plaintiff would send to defendant a bond guarantying the profit of $86.50.

The complaint contained all necessary allegations to entitle plaintiff to recover $173 upon the aforesaid contract. Defendant answered that his signature thereto was obtained by fraud; that plaintiff's agent represented to him at the time the same was signed that it was a commission contract, and that he affixed his signature thereto relying thereon; that as soon as he discovered the true character of the paper he repudiated it and refused to accept the goods contracted for thereby.

At the close of the evidence plaintiff's counsel moved for a directed verdict, which was overruled. The jury found as follows, in substance: (1) Plaintiff falsely represented to defendant that the agreement signed was for the acceptance and sale of goods upon commission, and that he would be entitled to return any thereof at any time he desired, and no charge would be made for goods so returned. (2) Defendant was induced to sign the contract by such false representations. (3) Plaintiff is entitled to judgment for $178.22 if for anything.

Thereafter plaintiff's counsel moved the court for judgment notwithstanding the verdict, and that being denied moved for a vacation of the first and second findings upon numerous grounds and for a new trial, which was also denied. Judgment was then rendered upon motion of defendant's counsel, dismissing the complaint with costs. The evidence, rulings, and exceptions, so far as necessary to be mentioned upon the appeal, will be stated in the opinion.

For the appellant there was a brief by *Kearney, Thompson & Myers,* and oral argument by *T. M. Kearney* and *W. D. Thompson.*

For the respondent there was a brief by *Cooper, Simmons, Nelson & Walker,* and oral argument by *J. B. Simmons.*

MARSHALL, J. The court, against appellant's objections, permitted evidence to be introduced respecting several transactions claimed to have taken place between its agent and strangers to the litigation, of the kind respondent was charged with. They were entirely independent of the occurrence under investigation. The evidence seems to have been offered to prove guilty intent on the part of appellant in making the alleged false representations which respondent claimed induced him to sign the contract. It was clearly irrelevant, and prejudicially so. It was entirely immaterial to plaintiff's cause of action whether its agent made false representations with specific bad intent or not. If false representations were in fact made, of such a character as to reasonably excuse respondent from reading the contract, and he was thereby induced to sign it without knowing its contents, it was competent for him to rescind the same if he acted seasonably. If a person knowingly or ignorantly makes a false statement of fact in a business transaction reasonably calculated to deceive another and induce him to do that which he would not do with knowledge of the truth, and which has that effect, the act of such other is attributable to fraud and is not binding upon him unless he subsequently ratifies it with knowledge of the facts or in some other way precludes himself from rescinding it. *Miner v. Medbury,* 6 Wis. 295; *Cotzhausen v. Simon,* 47 Wis. 103, 1 N. W. 473; *Davis v. Nuzum,* 72 Wis. 439, 40 N. W. 497; *Montreal R. L. Co. v. Mihills,* 80 Wis. 540, 50 N. W. 507; *Beetle v. Anderson,* 98 Wis. 5, 73 N. W. 560; *Hart v. Moulton,* 104 Wis. 349, 359, 80 N. W. 599; *Krause v. Busacker,* 105 Wis. 350, 354, 81 N. W. 406; *Zunker v. Kuehn,* 113 Wis. 421, 425, 88 N. W. 605.

In *Hart v. Moulton* the court said:

"Our own decisions are replete with precedents where false representations of material facts, made to induce a sale, relied upon by the seller, were held sufficient to render the sale voidable at the election of the seller, and that, whether the purchaser knew or did not know the representations made by him were false, it being held sufficient if he either knew or ought to have known the truth of his statements before making them."

Speaking on the same subject in *Krause v. Busacker,* the court said:

"If the representations were material and false, and the maker thereof either knew or ought to have known that they were false, or if he made them recklessly, with no knowledge on the subject, and the injured party relied upon them as true, without the present means of knowledge of their falsity, and suffered damage thereby, then the fraud is complete."

The law being so definitely settled, to permit in a case of this kind proof of numerous independent transactions claimed to be similar in kind to the one complained of, but in no way involved in the litigation, thereby throwing the burden upon the party so attacked of meeting a multitude of collateral charges neither suggested by the pleading nor proper to be so suggested, violates some of the fundamental principles of trial evidence, and in a most prejudicial manner. Jones, Ev. § 140. In *Baker v. State,* 120 Wis. 135, 97 N. W. 566, the court discussed at considerable length the circumstances under which other occurrences than the one charged and forming the subject of the judicial investigation may be given in evidence. An examination of that case will show that the doctrine has no application whatever to a case like this. It is one that applies within very narrow limits, and the danger of exceeding the same is so great that counsel and court should be exceedingly careful in entering the field at all.

The court excluded evidence offered by appellant to the

effect that its agent, in the transaction with respondent, was innocent of any bad intent. The ruling was proper for the reasons which require the ruling of the court heretofore discussed to be condemned, though we must say the two rulings are not consistent.

Respondent testified that he supposed when the contract was signed that it was a commission agreement and refused to abide thereby upon finding that it was of a different character. For the purpose of testing his credibility in that regard he was asked by appellant's counsel these and other questions of a similar character:

"Q. You never thought of the subject of consignment until after the suit was brought, did you?"

"Q. You never thought of the word 'commission' till after this suit was brought, did you?"

All of such questions were ruled out on objections by respondent's counsel. We cannot approve thereof. Respondent's case depended upon whether he was deceived into signing a contract different from the one made verbally between him and the agent. Within all reasonable limits, cross-examination of respondent respecting circumstances calculated in any appreciable degree to throw light on that subject should have been permitted. The right of cross-examination is of great importance in discovering the truth in a judicial investigation, and should be liberally allowed so long as anything of value is called for thereby. *McMahon v. Eau Claire W. W. Co.* 95 Wis. 640, 70 N. W. 829. It seems that the court plainly unduly limited appellant's right in that regard.

The most important complaint made by appellant's counsel is because the court failed to direct a verdict in its favor and failed to render judgment in its behalf notwithstanding the verdict, because the evidence was insufficient to warrant a finding that appellant was defrauded into signing the contract. The evidence and circumstances respecting that question are in the main as follows: The contract was made

June 4, 1902, and was plain. It expressly provided that goods were not to be furnished thereunder to be sold on commission. All its features were those of a sale, not a commission, contract. In two lines immediately above where respondent signed the paper were these words addressed to appellant:

"Please ship the goods herein described, on the terms and conditions herein stated, all of which we have carefully read and find complete and satisfactory. We understand that agreements to be binding must be noted hereon."

Immediately above the signature of appellant occurred this language:

"The amount of this order is payable in four equal payments due in two, four, six and eight months from date of invoice," etc.

Under respondent's signature and in close connection therewith, in a conspicuous way, was this language, plainly intended to form a part of the contract:

"*The Standard Mfg. Co.* to send a bond to the Commercial & Savings Bank of Racine, Wis., guaranteeing a profit of at least $86.50 for one year or to repurchase any goods on hand at purchase price as above provided."

Respondent testified thus:

I did not read the contract because I hadn't the time. That is my only excuse. I didn't have the time to read the two lines over my name. I didn't take the time. My business was urgent. I did not know what the amount of the contract was. I knew I was buying some extracts and toilet articles, but how much wasn't stated. I understood I had the goods on commission. There was no rate of commission, only we were to have $86.50, which was supposed to be our profit. The agent furnished me the contract after I signed it. No one prevented me from reading it. I put it on my desk. He said I didn't have to pay for the goods till they were sold. Relying on that I consented to trade. He asked me to sign my name. I asked him if the paper contained what we had talked about and he said yes. I relied on that. He asked me

to read it. I said I had no time. I asked him if he had made the contract with others who had read the paper. He answered, "Yes, lots of them." I am sure he asked me to read the paper before I signed it. I cannot say the word "commission" or word "consignment" was used. I understood I was not to pay for goods not sold. The agent said that. I did not ask him to read the contract. It is not customary for any of us to read such contracts. He asked me to read it someway. I asked him whether it contained what we talked about, and what he said I do not know. I really could not say for sure. He asked me to read it, but in what way he expressed himself I do not know. I never read the paper he left with me.

That fails to show with any degree of definiteness that appellant's agent made any representations to respondent that the paper was written according to the verbal understanding. At the end of respondent's cross-examination, as will be seen, he said he was not sure whether such representations were made or what was said. The only thing he seems to have been sure of is that he was requested to read the paper before signing it, and that the only reasons why he did not do so were because he was too busy and because he did not usually read such papers before signing them. True, after respondent confessed that he could not say "for sure" whether any representations were made to him as to the paper being written according to the verbal agreement, a direct question was put by the cross-examiner, evidently for the purpose of showing how readily respondent would return to his first story when his attention was drawn directly to the necessity therefor, as follows: "You asked him if it contained just what you and he talked?" to which he answered: "He said yes, he knew I was busy." Under the circumstances that hardly weakened his confession that he could not say whether the agent made any representations to him or not, as regards whether the paper was drawn according to the verbal understanding. True, he said on his direct examination that he was induced to sign the paper by the representations made

by the agent, but he also said, as we have seen, that the sole reason why he did not read the paper was that he was too busy; that he was requested to read it, and was not prevented by any person from doing so, and that it was customary to sign such papers without reading them.

In view of the well-settled principle that he who alleges fraud as a ground for relief in a judicial proceeding, to succeed, must establish the charge by a preponderance of the evidence, which also must be clear and satisfactory (*Rice v. Jerenson,* 54 Wis. 248, 11 N. W. 549; *F. Dohmen Co. v. Niagara F. Ins. Co.* 96 Wis. 38, 71 N. W. 69), and that other principle that he who signs or accepts a written contract, in the absence of fraud or mistake is conclusively presumed to know its contents and to assent thereto (*Wilcox v. Continental Ins. Co.* 85 Wis. 193, 197, 55 N. W. 188), it is extremely difficult to perceive how the verdict in this case can be justified by the evidence. There is no positive, consistent evidence that any false representations were made by appellant's agent respecting the contract, and certainly none which, under the circumstances, can fairly be said to excuse respondent for not knowing the character of the paper which he signed.

The law applicable to the aspect of this case last suggested has been so recently discussed that it seems hardly necessary to go over the subject again. *Bostwick v. Mut. L. Ins. Co.* 116 Wis. 392, 89 N. W. 538, 92 N. W. 246; *Kaiser v. Nummerdor,* 120 Wis. 234, 97 N. W. 932. It is there emphatically laid down that a person is bound to know the contents of a paper which he signs, no act of the adverse party or circumstance for which he is responsible occurring reasonably calculated under the circumstances to divert such person's attention therefrom, and which does so effectually. The fact that a false representation is made in respect to the paper is not necessarily sufficient to excuse such person for affixing his signature thereto in ignorance of its contents, unless

under all the circumstances, in view of his duty to give reasonable attention to the protection of his own interests, the false representation was still reasonably calculated to and did induce him not to make the investigation which he otherwise would have made. A person cannot sign a paper in ignorance of its contents and thereafter excuse such ignorance by the mere plea that he was busy or that he is habitually neglectful in such circumstances, and throw upon the courts the burden of protecting him from the consequences of his imprudence. The policy of the law is fixed to the effect that he who will not reasonably guard his own interests when he has reasonable opportunity to do so, and there is no circumstance reasonably calculated to deter him from improving such opportunity, must take the consequences. Courts do not exist for the purpose of protecting persons who fail in that regard. Where there is such inattention upon the one side and fraud upon the other, and but for the former feature the latter would not be effective, and loss occurs to the inexcusably negligent one, he is remediless; not because the wrongdoer can plead his own wrongdoing as an excuse for not making reparation, but, first, because the consequences are attributable to inexcusable inattention of the injured party; and second, because the court will not protect those who, with full opportunity to do so, will not protect themselves. Much difficulty has been experienced at times in not appreciating that there may be fraud upon one side, concurring with inexcusable ignorance upon the other, resulting in an injury, when but for the latter fault it would not have occurred, and there be no judicial remedy. That comes largely from paying more attention to eloquent passages in some judicial opinions condemning the wrongdoer—and not too severely—and condemning his attitude of confessing the wrong, so to speak, and shielding himself from the consequences, or attempting to do so, by the ignorance of his victim, than to the decision rendered and the real philosophy thereof, which will be

found, as a general rule, to be that the ignorance was in the particular case excusable, testing the conduct of the wronged party by the duty of every one to pay reasonable attention to his own interests. That difficulty is also largely attributable to the tendency of some authors to select such eloquent passages for their text instead of carefully deducing from the decision the rule of law applied in the case. A good illustration of that is the quotation relied upon by respondent's counsel from 1 Bigelow, Fraud, § 523:

"If the representation were of a character to induce action, and did induce it, that is enough. It matters not, it has well been declared, that a person misled may be said, in some loose sense, to have been negligent (in reality negligence is beside the case where the representation was calculated to mislead and did mislead); for it is not just that a man who has deceived another should be permitted to say to him, 'You ought not to have believed or trusted me,' or 'You were yourself guilty of negligence.' "

That was taken from the opinion of Justice DICKEY in *Linington v. Strong,* 107 Ill. 295. The point presented for decision was whether the court erred in giving the following instruction:

"The law requires every person to exercise reasonable prudence in business affairs, and before relieving a party from the obligations of a contract upon the ground of fraud, it must appear that he exercised reasonable care and prudence to learn the nature of the contract before executing it; if the defendant could read and had an opportunity to read the contract before signing, it was his duty to do so, unless induced not so to do by wilfully false statements of the plaintiffs, or one of them, as to its being a copy of the original; and if the defendant had full opportunity to read the contract before signing it, and was not induced to sign it by false statements made by plaintiffs, or either of them, the defendant would not be permitted to deny knowledge of the contents thereof."

The instruction was approved. It will very clearly be seen that it states the law quite differently from what might

be gathered from the quotation incorporated into the text by Mr. Bigelow.

We should say in passing that it is immaterial in such a case whether the statements were wilfully false or not, or whether the party making the false statements at the time thereof had any specific intent to deceive. In that respect the quoted instruction was open to serious criticism. The language of the learned judge in the opinion, which influenced the framing of the text we have taken the liberty to criticise, was evidently used forgetting for the moment the well known maxim, *"Vigilantibus, et non dormientibus succurrunt jura"* (the law assists the vigilant, not the careless). That under some circumstances the law leaves a party where it finds him, and that one of such circumstances is where one appeals for redress who is guilty of an inexcusable fault in falling into the difficulty complained of, is well settled.

Applying the foregoing to this case, admitting for the purposes thereof that there is some evidence tending to show false representations, it seems that respondent, upon his own testimony, was inexcusably ignorant of the contents of the paper he signed. He testified, in effect, that his eyesight was good, and the evidence shows that he was a business man of average intelligence and of considerable experience. A casual glance by such a person at the few lines in close connection with the signature would have acquainted him with the fact that he was not making a commission contract. A casual observation of the two lines immediately above his signature would have drawn to his attention the fact that he was signing a stipulation that he had read the contract and knew its contents and was satisfied therewith. Failure to observe those features, under the circumstances, leads to the conclusion that respondent in effect closed his eyes to what was plainly before him. He admitted over and over again that he was requested to read the paper; that the reason why he did not was because he was busy; and he said, as before

shown, that no one prevented him from reading it. There-was nothing about the relations between him and the agent to lull him into security. They were entire strangers to each other, and respondent and appellant were likewise strangers. The evidence shows that he was pressed to make the deal to such a degree as should have suggested the advisability of taking time to learn what was contained in the paper before affixing his signature thereto. To sign it as he did, after being requested to read it, when a mere glance at that portion immediately connected with where his pen rested on the paper would have informed him of the nature thereof upon the vital point, and the laying of the paper away and not looking at it when he had opportunity to do so, shows inexcusable inattention to his own interests in a high degree. His excuse that it was not customary for him in signing such papers to read them, instead of tending to show that his conduct was consistent with proper care, rather indicates habitual negligence. If under the circumstances stated appellant saw fit to shut his eyes not only when he signed the paper, merely because he was busy and it was customary for him to take that course, but thereafter when there was no reason of that kind to deter him from reading the instrument, relying upon the statement of a mere stranger acting in an adversary capacity as to what it contained, he cannot well complain if the courts have not time to open their doors to afford him relief.

The judgment must be reversed and a new trial ordered. If counsel for appellant had moved the court below to change the answers to the special questions so as to conform to the evidence on the subject of respondent's negligence, the case might go back for judgment in appellant's favor. Under the established practice a mere motion for judgment notwithstanding the verdict is no more than a motion for a directed verdict or a motion for a nonsuit, or a motion to set the verdict aside and grant a new trial, as regards a final disposi-

tion of the case without a new trial, upon the judgment entered adverse to such motion being reversed upon appeal.

*By the Court.*—The judgment appealed from is reversed, and the cause remanded for a new trial.